**UNITED STATES of America,**

v.

**John W. HINCKLEY, Jr.**

**No. CRIM.81–0306(PLF).**

United States District Court, District of Columbia.

Nov. 24, 2004.

Robert R. Chapman, Kasimer & Annono, P.C., Falls Church, VA, Thomas Edwin Zeno, U.S. Attorney's Office, Assistant U.S. Attorney, Washington, DC, for plaintiff.

Barry Wm. Levine, Adam Proujansky, Jodi Trulove, Dickstein Shapiro Morin & Oshinsky, LLP, Tanya Robinson, D.C. Corporation Counsel's Office, Washington, DC, for defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

On March 30, 1981, John W. Hinckley, Jr. attempted to assassinate the President of the United States, Ronald Reagan, in the driveway of the Washington Hilton Hotel. He wounded the President, Presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas Delahanty, and Mr. Brady suffered permanent brain damage. By a 13–count indictment filed on August 24, 1981, Mr. Hinckley was charged under federal law with attempted assassination of the President of the United States, assault on a federal officer, use of a firearm in the commission of a federal offense, and with attempted murder, multiple assault charges and a weapons charge under the District of Columbia Code.

After being found competent to stand trial, Mr. Hinckley filed a notice of intent to raise an insanity defense. At his criminal trial, Mr. Hinckley presented evidence that he suffered from a mental disease or defect that was responsible for his conduct on the day of the shootings, and, on June 21, 1982, a jury found him not guilty by reason of insanity on all counts of the indictment. Judge Barrington Parker thereupon committed Mr. Hinckley to St. Elizabeths Hospital under D.C.Code § 24–301, where he has remained to this day.[1]

Last year, this matter came before the Court on John W. Hinckley, Jr.'s petition for limited conditional release pursuant to D.C.Code § 24–501(k) and on the proposal by St. Elizabeths Hospital that Mr. Hinckley be granted a limited conditional release pursuant to D.C.Code § 24–501(e). After an evidentiary hearing, at which all of the experts agreed that conditional release was appropriate, the Court issued an Opinion and Order which denied Mr. Hinckley's petition and granted in part and denied in part the proposal submitted by St. Elizabeths Hospital. The Court granted Mr. Hinckley six local day visits within a 50–mile radius of the Hospital (Phase I) and two local overnight visits (Phase II) under the supervision of his parents, but without Hospital accompaniment. The Court also imposed a series of stringent conditions on the preparation for the visits, the visits themselves and the debriefing after the visits.[2] By all accounts, these visits were

1. This opinion refers to both D.C.Code §§ 24–301(e) and 301(k) and D.C.Code §§ 24–501(e) and 501(k). Section 501 is the current incarnation of the former Section 301. The historical petitions for conditional release were filed under Section 301.

2. Phase III of the Hospital's Section 501(e) proposal last year was six overnight 36–hour visits on weekends at his parents' home outside the Washington, D.C. area. The Court rejected this proposal in large part because of a lack of specificity and a lack of planning

entirely successful, Mr. Hinckley and his parents complied with all the conditions imposed by the Court, and the visits were very therapeutic.

The matter is again before the Court on John W. Hinckley, Jr.'s petition for limited conditional release pursuant to D.C.Code § 24–501(k) and on a proposal by St. Elizabeths Hospital that Mr. Hinckley be granted a limited conditional release pursuant to D.C.Code § 24–501(e). Mr. Hinckley's Section 501(k) proposal asks that Mr. Hinckley be allowed to have visits at his parents' residence outside the metropolitan Washington, D.C. area that are four nights in duration, beginning at 9:00 a.m. on the first day and continuing through 9:00 p.m. on the fifth day, with no more than two week intervals between each visit. *See* John W. Hinckley's Motion for Modification of Terms of Conditional Release ("Pet.Mot.") at 2. Many conditions are incorporated into the proposal, for the most part mirroring the conditions in the Court's December 2003 Order. Mr. Hinckley's proposal asks that the two week advance notice requirement entered by Judge Parker in 1987 as a stipulated order between the government and the Hospital be reduced to three days.

The Hospital's proposal under Section 501(e) requests that Mr. Hinckley be permitted to visit his parents' home outside the Washington, D.C. metropolitan area at Thanksgiving from Wednesday, November 24, 2004 at 9:00 a.m. until Monday, November 29, 2004 at 9:00 p.m. (five nights and six days). *See* Government's Exhibit ("Gov't Exh.") 04–35, November 4, 2004

Letter from St. Elizabeths Hospital ("2004 Hospital Letter") at 4. If this visit is successful, then Mr. Hinckley would be permitted to visit his parents' home at Christmas from Thursday, December 23, 2004 at 9:00 a.m. until Monday, December 27, 2004 at 9:00 p.m. (four nights and five days). *Id.* Future overnight visits would be contingent upon the approval of the Hospital Review Board with notification to and approval by the Court.[3]

The government opposes both Mr. Hinckley's petition and the Hospital's proposal. An evidentiary hearing on the requested relief was held on November 8, 9, 10 and 12, 2004. Closing arguments took place on November 15, 2004. In examining the evidence, the Court notes that Mr. Hinckley's petition under Section 501(k) is opposed not only by the government, but also by the Hospital and the majority of the testifying experts. The Hospital's proposal for conditional release under Section 501(e) is likewise opposed by the government and the government's expert witnesses. Based on the evidence and arguments presented to the Court, as well as the evidence presented at last year's hearing and the entire record in this case, and for the reasons that follow, the Court denies Mr. Hinckley's petition and rejects the Hospital's proposal. The Court will, however, allow limited visits identical to those already successfully completed while the Hospital more fully explores the relationship between Mr. Hinckley and his former girlfriend, Leslie DeVeau.

---

with respect to Phase III and because of a desire to have reports on the success of Phase I and Phase II before determining whether, and under what conditions, visits outside the Washington, D.C. area would be appropriate. *See United States v. Hinckley,* 292 F.Supp.2d 125, 148 (D.D.C.2003).

3. The Court announced at the conclusion of the evidentiary hearing that Mr. Hinckley, his parents and the Hospital should understand that the time and care required to decide this matter and issue an opinion made a Thanksgiving visit impossible even if the Court were otherwise to agree with the Hospital's proposal.

## I. BACKGROUND

### A. Legal Framework

 D.C.Code § 24–501(k) provides that a person in the custody of a mental hospital after being acquitted by reason of insanity may seek his conditional or unconditional release from the custody of the hospital by filing an appropriate motion with the court. D.C.Code § 24–501(e) provides that the superintendent of the hospital on his own may at any time certify that the mental health of the person has sufficiently improved such that he will not "in the reasonable future be dangerous to himself or others" if conditionally released. D.C.Code § 24–501(e); *see Hough v. United States*, 271 F.2d 458, 461 (D.C.Cir.1959) (for conditional release "the court must conclude that the individual has recovered sufficiently so that under the proposed conditions [or others] 'such person will not in the reasonable future be dangerous to himself or others.'"). In either case, it is for the court to determine whether the person warrants conditional release and, if so, under what conditions. *See* D.C.Code §§ 24–501(e), 501(k).

 As explained last year, whether the court is considering a patient's petition or the superintendent's certificate, unless the request is uncontested or the outcome plain, the court must hold a hearing to determine the present mental condition of the person and whether, if released, he will be a danger to himself or others in the reasonable future. *See* D.C.Code §§ 24–501(e), (k). When the matter comes before the court on a petition under D.C.Code § 24–501(k), "the person [seeking release] shall have the burden of proof," and the court must find "by a preponderance of the evidence" that the

person is entitled to conditional release. D.C.Code § 24–501(k). The statute does not make clear who carries the burden of proof in a hospital-initiated release proposal. *See* D.C.Code § 24–501(e). Regardless of who bears the burden of proof or persuasion, the hospital's proposal under D.C.Code § 24–501(e) should only be approved if the evidence shows that the proposed conditional release is appropriate under the standards set forth in the statute by a preponderance of the evidence. *See United States v. Ecker*, 543 F.2d 178, 188 (D.C.Cir.1976) (district court must make an "affirmative finding that it is at least more probable than not" that the patient will not be violently dangerous in the future); *DeVeau v. United States*, 483 A.2d 307, 310 (D.C.1984) (preponderance standard endorsed).[4]

 In considering either a hospital-initiated or a patient-initiated request for conditional release, the district court is obligated to make its own independent judicial determination regarding the patient's dangerousness. *See United States v. Ecker*, 543 F.2d at 184. The function of the court is to determine whether the facts as shown by the evidence offered "measure up to the statutory standards for release." *Id.* at 185. In order to grant release, the court must determine that the patient, under the proposed conditions, "will not in the reasonable future be dangerous to himself or others." *Hough v. United States*, 271 F.2d at 461; *see also United States v. Ecker*, 543 F.2d at 187. Under this standard, the existence of "a substantial problem of danger in the reasonable future provides an adequate basis for the continued detention and confinement of an insanity acquittee" who has committed a violent act. *United States v. Ecker*, 543

4. For additional background on Mr. Hinckley's history and previous release requests as well as a further description of the legal framework, *see United States v. Hinckley*, 292 F.Supp.2d 125, 127–133 (D.D.C.2003).

F.2d at 188. If, on the other hand, the evidence shows by a preponderance of the evidence that the patient will not be a danger under the proposed or other reasonable conditions of release, then the court must grant the petition for conditional release.[5]

■ As the government points out, in receiving and considering the evidence, a court is not required to accept the opinion of any expert witness, or even the unanimous opinion of all the experts, but must consider all relevant evidence including "the patient's hospital file, the court files and records in the case, and whatever illumination is provided by counsel." *United States v. Ecker*, 543 F.2d at 184–85; *see also id.* at 190 ("the issue of 'dangerousness' presents the district court with a difficult mixed question of law and fact, and the court is under no obligation to accept the experts' opinions on questions of law"). The court must independently weigh the evidence and decide for itself the ultimate question whether if released under appropriate conditions the patient will not in the reasonable future be dangerous to himself or others. *See id.* at 187. The court must take care, however, to base any denial of release on the evidence itself, and not substitute its own opinion for the evidence presented by the parties. *See id.* at 185 and n. 20.

### B. Relationship with Leslie DeVeau

The government argues that Mr. Hinckley has failed to carry his burden under Section 501(k) of the statute and that the Hospital's proposal fails to satisfy the requirements of Section 501(e). More specifically, the government argues that release should be denied because (1) the nature of Mr. Hinckley's relationship with Leslie DeVeau is not clear and it therefore cannot be certain that he has successfully handled a break-up of the relationship; (2) Mr. Hinckley has a long history of deception and evasiveness and he continues to be deceptive with his treaters and the government experts with respect to the nature of his relationship with Ms. DeVeau and other matters; (3) during the past year the Hospital failed to address the nature of the relationship, the most important potential risk factor identified at last year's hearing; and (4) for these reasons, and because no one knows how Mr. Hinckley has reacted to Ms. DeVeau's recent statements to Dr. Keisling just before the hearing and to Dr. Binks and the treatment team during a two-hour meeting during the hearing, the Court cannot be confident that the treatment team is able accurately to evaluate Mr. Hinckley's condition at this time. The government believes that Mr. Hinckley still poses a substantial risk of danger and that he cannot safely travel to his parents' home away from the Washington, D.C. metropolitan area for limited periods of time, or even safely be permitted additional Phase I or Phase II outings, under the supervision of his parents even under the conditions proposed by the Hospital.

At the evidentiary hearing before this Court a year ago, the issues of Mr. Hinckley's relationship with Leslie DeVeau and his history of deceptiveness were raised by the government and discussed by the witnesses. Dr. Montalbano testified that Mr. Hinckley exercised "poor judgment" and "deliberately withheld important information" when he failed to advise the treatment team that Ms. DeVeau, his then girlfriend, had told him that she had purchased a book about Jodie Foster in 2000.

---

5. The court may modify or expand upon the conditions proposed by the hospital. *See* D.C.Code § 24–501(e) (conditional release "under such conditions as the court shall see fit").

See United States v. Hinckley, 292 F.Supp.2d at 134. Dr. Montalbano testified, however, that poor judgment is not necessarily linked to an increased risk of dangerousness. See Transcript of November 2003 Evidentiary Hearing ("2003 Tr.") Vol. IV at 85 (Dr. Montalbano). Dr. Keisling testified that he did not think that Mr. Hinckley's failure to inform the treatment team about this matter constituted "evidence of evasiveness, deceptiveness or dangerousness." See United States v. Hinckley, 292 F.Supp.2d at 137. By contrast, both Dr. Phillips and Dr. Patterson found it troubling that Mr. Hinckley withheld this information from the treatment team and from Dr. Phillips, and Dr. Phillips testified that the incident is "directly connected to Mr. Hinckley's lack of forthrightness." See id. at 139–40.

Dr. Binks and Dr. Keisling testified about "the end of Mr. Hinckley's 16–year romantic relationship with Leslie DeVeau," and that Mr. Hinckley had told the doctors that he and Ms. DeVeau are "just friends" who "talk daily by telephone." United States v. Hinckley, 292 F.Supp.2d at 136. They testified that Mr. Hinckley was appropriately saddened by the end of the romantic relationship, but that he handled the stress well and showed no evidence of depression. See id. Based upon his interview with Mr. Hinckley and the fact that Ms. DeVeau refused to be interviewed in the absence of her attorney, Dr. Phillips was not convinced that enough was known about the relationship and testified that he believed it necessary to get a "clearer understanding" of the nature of the relationship between Mr. Hinckley and Ms. DeVeau. Id. at 140. He recommended that Ms. DeVeau be excluded from the visits by Mr. Hinckley with his parents "as a risk management measure" until such clarification has been obtained. Id. at 142.[6]

With respect to the issues of deceptiveness and the relationship between Mr. Hinckley and Ms. DeVeau, the Court stated in its Opinion last year: "Contrary to the current inclination of the Hospital, Mr. Hinckley will not be allowed any contact with Ms DeVeau, either in person or through any other medium, during the course of the conditional release. The Court echoes the concerns raised by Dr. Phillips regarding the possibility of deception surrounding the relationship and the lack of clarity concerning its current nature. Any contact with Ms. DeVeau during a conditional release will be considered a violation of the conditional release...." United States v. Hinckley, 292 F.Supp.2d at 150.

## II. EVIDENTIARY HEARING

At the evidentiary hearing earlier this month, counsel for Mr. Hinckley called as witnesses: (1) Dr. Sidney W. Binks, a Ph.D. psychologist specializing in neuropsychiatric disorders, who has been a member of Mr. Hinckley's treatment team and his treating psychologist since 1999; (2) Dr. Robert Keisling, a psychiatrist and former Medical Director of the Forensic Inpatient Service at John Howard Pavilion at St. Elizabeths Hospital, who was Mr. Hinckley's treating psychiatrist from mid–1998 until September 1999; (3) Dr. Paul Montalbano, Pretrial Chief at the Forensic Services Unit at John Howard Pavilion at St. Elizabeths Hospital, who conducted psychological risk analyses of Mr. Hinckley in 1999, 2003 and 2004; and (4) Mrs. Diane Hinckley Sims, Mr. Hinckley's sis-

6. While the Hospital did not favor prohibiting all contact between Mr. Hinckley and Ms. DeVeau during the outings, both Dr. Binks and Dr. Keisling testified that they found it acceptable that Ms. DeVeau would not be part of any of the outings. See United States v. Hinckley, 292 F.Supp.2d at 143.

ter. The government called as witnesses: (1) Dr. Robert Phillips, a psychiatrist and former Director of Forensic Services for the State of Connecticut Department of Mental Health, who examined Mr. Hinckley at the request of the government in 2000, 2003 and 2004; and (2) Dr. Raymond F. Patterson, a psychiatrist, former Medical Director and former Acting Associate Superintendent at St. Elizabeths Hospital, former Commissioner of Mental Health in the District of Columbia, and former Forensics Director for the State of Maryland, who testified in opposition to Mr. Hinckley's conditional release at the 1997 hearing before Judge June Green and testified in support of his conditional release at the 2003 hearing before this Court.

### A. Expert Testimony and Reports

The expert witnesses for both Mr. Hinckley and the government were in substantial agreement concerning Mr. Hinckley's current diagnosis both at the 2003 hearing and at this hearing. All of the experts, with the exception of Dr. Keisling, agree that Mr. Hinckley's current diagnosis is psychotic disorder, not otherwise specified ("psychotic disorder NOS"); major depression; and narcissistic personality disorder.[7] All agree that both the psychotic disorder NOS and the major depressive disorder, his Axis I disorders, are in full remission. All the experts agree that there have been no active symptoms of psychosis or major depression in a number of years. As to Mr. Hinckley's Axis II disorder, narcissistic personality disorder, Dr. Montalbano, Dr. Binks and Dr. Patterson testified that the narcissism is "significantly attenuated."

The doctors noted that Mr. Hinckley remains self-medicated on 1mg of Risperdal per day. The Risperdal is purely pro-

phylactic and is intended to prevent a relapse of his psychotic disorder. At the 2003 hearing, Dr. Keisling testified that if Mr. Hinckley were to miss the medication, there would be no immediate physiological change, and he would probably have to miss several weeks before the lack of medication would be physiologically significant. Dr. Keisling reiterated this year that if Mr. Hinckley did not take his medication during a four or five day period away from the Hospital there would be no immediate effect.

All the experts who testified had access to four psychological risk assessments of Mr. Hinckley conducted by Dr. Paul Montalbano in 1999 and 2003 based on a battery of psychological tests administered by Dr. Montalbano. Dr. Montalbano issued an update of his psychological risk assessments just prior to the commencement of this hearing. No new psychological testing was performed for the 2004 risk assessment, but Dr. Montalbano concluded that there was no significant change from the last assessment performed in August of 2003. See Gov't Exh. 04–30, November 1, 2004 Psychological Risk Assessment Update ("Nov.2004 Risk Assess.") at 17.

### 1. Petitioner's Expert Witnesses

Dr. Sidney Binks, Mr. Hinckley's treating psychologist at the Hospital since 1999, and Dr. Robert Keisling, Mr. Hinckley's treating psychiatrist from mid–1998 until September 1999, who was retained as a consultant by Mr. Hinckley's lawyers in this case, both testified that Mr. Hinckley would not be a danger to himself or others under the conditions proposed in either the Section 501(e) or the Section 501(k) proposal. Both doctors agree that there is no basis to believe there would be deteriora-

---

**7.** Dr. Keisling opined that Mr. Hinckley does not currently meet the diagnostic criteria for narcissistic personality disorder. Drs. Binks, Montalbano, Patterson and Phillips all agree that Mr. Hinckley still has narcissistic personality disorder.

tion or decompensation during the visits. Both doctors also expressed the view that Mr. Hinckley will comply with whatever conditions of release are imposed.[8]

Dr. Keisling stated that he was aware of no behavior by Mr. Hinckley that would militate against granting either of the conditional release proposals. Dr. Keisling noted that Mr. Hinckley had complied with all of the conditions of release on the eight visits with his parents in the Washington, D.C. metropolitan area and stated that it is clinically significant that the visits went well. Dr. Binks agreed that Mr. Hinckley's outings with his parents have gone very well and that he complied with all of the conditions of release. Dr. Binks noted that the visits were "very therapeutic" for Mr. Hinckley.

The reports submitted by both of the government's experts in preparation for this hearing indicated a concern that the relationship between Mr. Hinckley and Leslie DeVeau, his former girlfriend—also an insanity acquitee—lacked clarity.[9] It is undisputed that Mr. Hinckley currently speaks with Ms. DeVeau twice a day on the telephone and sees her once a week when she delivers cat food to him at the Hospital. Dr. Binks does not believe there is a lack of clarity concerning the relationship between Mr. Hinckley and Ms. De-Veau, and he believes that the current level of contact between them is appropriate. Dr. Binks explained that the telephone communications are quite short (usually five to ten minutes) and that they generally involve discussions about how their day is going and the events of the day.

Dr. Binks believes that the displays of affection between Mr. Hinckley and Ms. DeVeau have ceased and that Mr. Hinckley no longer has romantic feelings for Ms. DeVeau. Dr. Binks believes that the change from a romantic to a platonic relationship occurred gradually and was official approximately 18 to 24 months ago. Dr. Keisling agreed that although Ms. De-Veau and Mr. Hinckley previously had a romantic relationship, both Ms. DeVeau and Mr. Hinckley have indicated that the relationship has changed from one of romance to one merely of friendship. Dr. Binks believes that Mr. Hinckley still loves

---

8. Mr. Hinckley's parents would act as his custodians on these proposed visits, as they have on the outings during the past year. Dr. Binks considers Mr. Hinckley's parents to be "very educated" on the subject of mental health and notes that they have proven that knowledge to the treatment team. In his view, they would be able to detect any decompensation during the visits. No expert expressed concern about Mr. Hinckley's parents' ability to serve as responsible custodians.

Dr. Binks explained that the Hinckleys have located Dr. John Lee to serve as a psychiatrist living near their residence with whom Mr. Hinckley could consult if necessary while visiting his parents, and that Mr. Kevin Shamblee, a social worker from Mr. Hinckley's treatment team, visited Dr. Lee and both the Hinckleys' home and the surrounding community to assess the environment. Dr. Phillips believes that the fact that Dr. Lee is not a forensic psychiatrist could make him an inap-

propriate choice going forward. Dr. Phillips does feel, however, that Dr. Lee could certainly serve as a safety net to provide care and treatment at the parents' home should it become necessary. Dr. Phillips notes that there might be some need to supplement his capacities in the future, but that he is well suited to serve as a therapist.

9. All of the experts testified during the November 2003 hearing that Mr. Hinckley had informed them that the romantic relationship between Mr. Hinckley and Ms. DeVeau had ended and that Mr. Hinckley seemed to have dealt with the termination of the relationship appropriately. *See United States v. Hinckley*, 292 F.Supp.2d at 136, 140. During that hearing, after learning that Mr. Hinckley and Ms. DeVeau were still in daily contact, Dr. Phillips expressed concern that the relationship lacked clarity. *See id.* at 140.

Ms. DeVeau as a friend, and Dr. Keisling stated that Mr. Hinckley does still wear a ring given to him by Ms. DeVeau.[10] Dr. Binks testified, however, that there is no evidence that Mr. Hinckley is fantasizing about his relationship with Ms. DeVeau. Dr. Keisling agreed that Mr. Hinckley understands the difference between romance and friendship and that he is not fantasizing in connection with the relationship. Dr. Binks believes that Mr. Hinckley has already dealt with the end of the romantic relationship successfully, and that the current relationship is best characterized as a "very good friendship with a long history." [11]

Despite the concerns expressed by Dr. Phillips, Dr. Patterson and the Court at last year's hearing, no one from the Hospital had been in contact with Ms. DeVeau for over a year when this hearing started on November 8, 2004. Dr. Binks testified that after conjoint therapy (that is, joint sessions with the patient, Mr. Hinckley, his significant other, Ms. DeVeau, and the treatment team) ceased at the end of 2001, the treatment team continued to meet with Ms. DeVeau quarterly in connection with Mr. Hinckley's treatment plan.[12] The quarterly meetings stopped approximately one month before the 2003 hearing. It has been two years since Dr. Binks personally has been in contact with Ms. DeVeau. Dr. Binks opined that the treatment team's lack of contact with Ms. DeVeau did not create a risk of dangerousness in the short term under either the Hospital's proposal or Mr. Hinckley's proposal. The relationship, a friendship, is real, not fantasized and, in Dr. Binks' view, there is no lack of clarity as to the nature of the relationship.

A few days before the hearing, Dr. Keisling met with Ms. DeVeau in the presence of her attorney. As in 2003, the government experts had refused to meet with Ms. DeVeau in preparation for this hearing because she insisted on having her lawyer present, which both Dr. Patterson and Dr. Phillips found to be clinically unacceptable. Dr. Keisling indicated that Ms. DeVeau answered every question he asked and that her lawyer did not interfere with the interview in any way. Ms. DeVeau told Dr. Keisling that her relationship with Mr. Hinckley is no longer romantic and that the change was gradual once she stopped working on the grounds of St. Elizabeths. Ms. DeVeau noted that she and Mr. Hinckley still talk twice daily by telephone and she sees him once a week to deliver cat food. Ms. DeVeau indicated that, because of an incident involving Mr. Hinckley's reading materials a number of years ago, the Secret Service obtained copies of her financial records, searched through her trash, and followed her. She came to the conclusion that she needed to scale back the relationship in order to maintain her own personal privacy. Ms. DeVeau

---

10. Dr. Keisling testified that Mr. Hinckley received the ring from Ms. DeVeau about ten years ago. Dr. Montalbano and Dr. Keisling testified that there had been a previous exchange of rings in 1983 or 1985. The Court notes that Mr. Hinckley was wearing the ring for the first two days of testimony, was not wearing the ring for the second two days of testimony, and was wearing the ring again for closing arguments.

11. Dr. Binks opined, however, that if Mr. Hinckley again evidenced romantic feelings towards Ms. DeVeau and they were not recip- rocated, this would raise issues that the treatment team would have to explore.

12. Dr. Keisling testified that Ms. DeVeau left conjoint therapy because she felt "threatened" when the conversation turned to her own personal history and background. She does not want a "therapeutic" relationship with the Hospital staff. Dr. Binks testified that Ms. DeVeau was a willing participant in the conjoint therapy, but she did not like the process and gradually withdrew.

explained that there is no longer hugging, kissing or other romantic behavior between Mr. Hinckley and herself. Ms. DeVeau indicated that she does not wish to terminate the friendship because both she and Mr. Hinckley get a lot of support from each other, but she would do so if the Court so ordered.

Dr. Keisling testified that Mr. Hinckley's version of events agreed with that of Ms. DeVeau. Having talked with both of them, he finds no lack of clarity on the part of either Ms. DeVeau or Mr. Hinckley concerning the nature of their relationship and sees no evidence that Mr. Hinckley is being deceptive. Dr. Keisling does not believe that the continuing relationship between Mr. Hinckley and Ms. DeVeau raises any concerns regarding Mr. Hinckley's risk of dangerousness during a limited conditional release to his parents' home. Unlike the delusional relationship with Jodie Foster, Mr. Hinckley's relationship with Ms. DeVeau is grounded in reality. Dr. Binks testified that even if Mr. Hinckley did still have romantic feelings for Ms. DeVeau, that would not be an indication of dangerousness. Dr. Keisling testified that, unless there are indications that Mr. Hinckley is engaging in some sort of "dangerous behavior", there is no concern raised even if Mr. Hinckley harbors hopes of the resumption of a romantic relationship with Ms. DeVeau. Dr. Keisling testified, however, that there is no such indication, and that he has obtained no information that would indicate that Mr. Hinckley is not being forthcoming with respect to the nature of his relationship with Ms. DeVeau. Dr. Keisling believes that Mr. Hinckley could cope and would not be dangerous or psychotic if Ms. DeVeau were to tell him she never again wanted a romantic relationship or even if she broke off their friendship entirely. Dr. Keisling believes that there is a very

low risk of decompensation even if that were to happen.

Dr. Keisling believes that the current requests for conditional release represent a normal progression of expansion of privileges after the first level of privileges has gone well. While he agrees that it is important for the Hospital to understand the nature of the relationship between Mr. Hinckley and Ms. DeVeau, and thinks it would be useful for the treatment team to talk to Ms. DeVeau, he does not believe there is any reason for her to be an "integral" part of the treatment process. Dr. Binks indicated that he would like to see ongoing communication between Ms. DeVeau and the treatment team. Both Dr. Binks and Dr. Keisling agreed that it would not be inappropriate or inadvisable for Mr. Hinckley and Ms. DeVeau to have telephone contact while Mr. Hinckley is on conditional release. Indeed, Dr. Binks stated that it would be better to permit Mr. Hinckley to have contact with Ms. DeVeau during the visits because it is normal to talk to a good friend on the telephone even when one is in a different location; the contact would mitigate dangerousness.

Dr. Paul Montalbano, the Pretrial Chief at St. Elizabeths Hospital and a member of the Hospital Review Board, testified that he was authorized to speak on behalf of the Hospital for purposes of the hearing and in support of its Section 501(e) proposal. As noted, Dr. Montalbano did psychological risk assessments of Mr. Hinckley in 1999, 2003 and 2004. Dr. Montalbano participated in the debriefing of Mr. Hinckley and his parents after each of the eight outings in the past year and prepared the reports of the visits submitted to the Court. He testified that the outings were successful and therapeutic and furthered the goal of reintegration into the community. He believes that, although there are

concerns about the age of Mr. Hinckley's parents and about periods of confusion during the visits, as a couple the Hinckleys are responsible custodians. Dr. Montalbano concluded that Mr. Hinckley would not be a danger to himself or others in the context of the Hospital's current Section 501(e) proposal. Dr. Montalbano acknowledged that the Section 501(e) proposal this year involves significantly longer visits than the proposed Phase III visits that were rejected by the Court in 2003. He also acknowledged that the treatment team proposed shorter visits to the Review Board than the Section 501(e) letter finally proposed. He noted, however, that the Review Board's Section 501(e) proposal was less open-ended.

Dr. Montalbano testified that Mr. Hinckley's dangerousness has, in the past, arisen as a result of a number of variables including suicidal depression, delusions, obsession and intense self-absorption, but there has been no significant depression for 15 years and no evidence of delusions for at least 12 years. Dr. Montalbano noted that Mr. Hinckley's narcissism is significantly attenuated. Dr. Montalbano's risk assessment update explained that the "constellation of primary risk factors such as depression, isolation, anger, self-absorption and psychosis remain largely absent or significantly reduced." Nov.2004 Risk Assess. at 19. Dr. Montalbano acknowledged that Mr. Hinckley has defensiveness linked to poor insight and that honesty and openness are areas of concern for him. He also acknowledged that Mr. Hinckley has poor judgment at times. Dr. Montalbano's risk assessment update expressed concern that Mr. Hinckley demonstrated a "lack of psychological mindedness" which

was "manifested by his failure to completely integrate the ramifications of his decision-making around his relationship with Ms. DeVeau." Nov.2004 Risk Assess. at 17. Dr. Montalbano noted, however, that there is "no evidence of behavioral or affective instability." *Id.* Dr. Montalbano testified that Mr. Hinckley's mood has been elevated by the conditional release outings and that Mr. Hinckley stated that the outing with his brother and sister was the "happiest day of his life." Dr. Montalbano noted that the mood improvement Mr. Hinckley experiences on outings ameliorates the risks of depression.

Dr. Montalbano was asked to comment on the nature of the relationship between Mr. Hinckley and Ms. DeVeau, a matter he has discussed with Mr. Hinckley. He testified that in the latter part of 2002, Ms. DeVeau changed the relationship with Mr. Hinckley from a romantic relationship to one that was no longer romantic. Dr. Montalbano believed, at the time of the 2003 hearing, that the contacts between Ms. DeVeau and Mr. Hinckley would continue to diminish. Dr. Montalbano acknowledged that parts of the relationship between Mr. Hinckley and Ms. DeVeau are unclear, that there was less of a separation than he thought, and that he himself was surprised at the current level of contact. Dr. Montalbano believes that Mr. Hinckley's previous statements that the relationship was over and that he was dealing well with it were related to the fact that the contacts between Ms. DeVeau and Mr. Hinckley were decreasing at that time. Dr. Montalbano testified that now that the relationship has been more clearly established as a friendship, the frequency of contact has increased.[13] Dr. Montalbano

13. During the treatment team's subsequent interview with Ms. DeVeau, she indicated that the level of contact had been the twice daily telephone calls and once weekly visits since their relationship changed in 2000. The Court notes that the testimony at the hearing in 2003 indicated that Mr. Hinckley told Dr. Montalbano that he had "frequent contact"

believes that the relationship is an important emotional support for Mr. Hinckley and an important part of his recovery; it is therapeutic and beneficial. Dr. Montalbano testified, however, that Mr. Hinckley's method of coping with the world is to try not to be aware of uncomfortable feelings and therefore Mr. Hinckley's statement that he was dealing well with the end of the relationship was his attempt to put himself in a favorable light and perhaps to not focus on the negative aspects of the situation.

Dr. Montalbano explained that there is a "dilemma" between the fact that Ms. De-Veau, with whom the treatment team had no contact (as of the day the hearing began), is an important emotional support for Mr. Hinckley and the fact that, if the previous conditions imposed by the Court remain intact for any future conditional release, Mr. Hinckley would not be permitted to speak with Ms. DeVeau during any future conditional release. Dr. Montalbano believes that this dilemma must be resolved while Mr. Hinckley is still in a structured environment, but does not feel that the risk factors associated with the dilemma are correlated with any significant risk of decompensation or danger. Dr. Montalbano therefore believes that the resolution of the relationship can go forward at the same time as a further conditional release regimen. Although Dr. Montalbano does not feel that there should be a prohibition on contacts with Ms. De-Veau while Mr. Hinckley is on conditional release because the relationship is therapeutic, he believes that Mr. Hinckley could safely manage the Hospital's proposed outings with or without a bar on contact with Ms. DeVeau.

2. Government's Expert Witnesses

Dr. Robert Phillips and Dr. Raymond F. Patterson, both psychiatrists, testified for the government. Dr. Phillips and Dr. Patterson oppose both Mr. Hinckley's petition under Section 501(k) and the Hospital's proposal under Section 501(e). Both doctors believe that Mr. Hinckley is currently mentally ill, although they agree that his Axis I diagnoses—psychotic disorder NOS and major depression—are in full remission, and Dr. Patterson agrees that his narcissistic personality disorder (Axis II) is attenuated. In addition to the Axis I and II diagnoses, Dr. Phillips also lists the following Axis IV diagnosis in his November 1, 2004 report: "Psychosocial Stressors—acutely related to motion for modification of terms of conditional release; psychosocial and environmental problems related to his proposed transition to community living; lack of clarity regarding the relationship with his significant other." *See* Gov't Exh. 04-01 November 1, 2004 Report of Dr. Robert Phillips ("Phillips Rep.") at 26–27. Dr. Patterson lists the following Axis IV diagnosis: "Current stressors include long-term mental illness and personality disorder, involvement with criminal justice system, ambiguity of his relationship with significant other, and reintegration with society." *See* Gov't Exh. 01-02, October 29, 2004 Report of Dr. Raymond Patterson ("Patterson Rep.") at 10. Both testified at the hearing that the relationship

---

with Ms. DeVeau by telephone (2003 Tr., Vol. IV at 45 (Dr. Montalbano)), and that they talk "on a daily basis" (2003 Tr. Vol. IV at 152 (Dr. Montalbano)); that Dr. Patterson's 2003 report indicated that Mr. Hinckley told him that he talked with Ms. DeVeau "every day," and that he testified that he understood there were "daily phone calls." (2003 Tr., Vol. III at 72, 96 (Dr. Patterson)). Dr. Phillips testified at last year's hearing that he was "under the impression" from his conversations with Mr. Hinckley that he spoke with Ms. DeVeau "rarely" and only learned at the hearing that the telephone calls were occurring "nightly" or "once a day." (2003 Tr., Vol. II at 56–57, 80 (Dr. Phillips)).

with Ms. DeVeau is a psychosocial stressor that needs to be resolved. Dr. Patterson testified that the attenuation of Mr. Hinckley's narcissism is in some ways a reflection of the fact that treatment—the structured environment, the supportive services, medication, the absence of stressors—is working.

Dr. Phillips and Dr. Patterson testified that Mr. Hinckley's affect has improved, that he has shown progress in his interpersonal interactions since last year and that he has made progress in being more forthright with his treatment team and other clinicians. Dr. Phillips acknowledged that Mr. Hinckley has demonstrated stability in his emotional state. Dr. Patterson agreed that Mr. Hinckley does not currently have any suicidal or homicidal ideation and that he is not currently delusional. Both Dr. Patterson and Dr. Phillips agreed that the conditional release visits were successful and that Mr Hinckley complied with all the conditions imposed by the Court. Both also agreed that the visits were therapeutically beneficial.

Dr. Patterson reminded the Court that the risk of dangerousness includes not only the risk to others, but the risk to self, and that he therefore continues to be concerned about the relationship between depression and violence. Although Dr. Patterson agreed that there has been no evidence of psychosis or depression in many years, he noted that it would be unwise to try to compartmentalize complex human behavior by saying that Mr. Hinckley's Axis I disorders—psychosis and depression—are gone or in remission and therefore his Axis II disorder—narcissism—is not as important. Dr. Patterson explained that the two most important aspects of narcissistic personality disorder for Mr. Hinckley are the exploitativeness of relationships, which means being guarded or deceptive with information, and a sense of entitlement; the issue of deception is at the top of Dr. Patterson's list of concerns.

In connection with "guardedness," Dr. Patterson testified that the only general area of concern with respect to Mr. Hinckley's judgment had to do with Mr. Hinckley's relationship with Ms. DeVeau. Dr. Phillips testified that he has "serious clinical concerns" regarding the relationship. Dr. Patterson explained that Mr. Hinckley's pathology has always related to his perceptions of his relationships with women and that he has previously fantasized about those relationships. Dr. Phillips agreed that it is especially important to understand Mr. Hinckley's relationships because they are one of the most important clinical factors and have always come to the foreground when he has been most clinically dysfunctional.[14] Dr. Phillips believes that there could be short term risk arising from Mr. Hinckley's relationship with Ms. DeVeau if it becomes clear to Mr. Hinckley that his belief about the relationship is significantly different from her own. Dr. Patterson noted that the current lack of clarity in the relationship could be the result of deception or simple naivete. Because relationships, real or imagined, and disturbances in relationships have been fundamental to Mr. Hinckley's condition, however, the relationship with Ms. DeVeau is "extraordinarily important."

14. Both were referring not only to the delusional and obsessive "relationship" with Jodie Foster, but also to Mr. Hinckley's infatuation with the Chief Pharmacist at the Hospital, which was described by Dr. Patterson as being "at least obsessive" and "bordering on fantasy," and as bearing "striking similarities" to the pattern of behavior Mr. Hinckley evidenced towards Jodie Foster prior to the attempted assassination of President Reagan. United States v. Hinckley, 292 F.Supp.2d at 128.

Dr. Patterson testified that the potential for abandonment or rebuff in a relationship is a huge risk factor for Mr. Hinckley; in the past his responses to perceived rejection have been "dramatic and dangerous." Dr. Patterson noted how important it was in 2003 that all of the experts thought that the relationship with Ms. DeVeau was over or was ending and that Mr. Hinckley had dealt well with the end of his relationship. In contrast to his and the other experts' understanding in 2003, however, Dr. Patterson noted that the current level of contact has not decreased and may have increased since the 2003 hearing.[15] Dr. Patterson also noted that Mr. Hinckley has stated that he still loves Ms. DeVeau. When asked by Dr. Patterson how Ms. DeVeau would respond if Mr. Hinckley told her he loved her, Mr. Hinckley said that "maybe she would smile and say I love you, too." Dr. Patterson now believes that the relationship was not over in 2003 as reported by Mr. Hinckley. At the very least, he testified, the treatment team needs to explore whether the relationship has ended, whether it has changed, whether the romance is being rekindled, what Ms. DeVeau wants the relationship to be, and how Mr. Hinckley reacts to what she wants.

Dr. Phillips likewise expected to see a continued decline in the contact with Ms. DeVeau because he thought the romantic relationship was over and the relationship was waning. He certainly expected the issue to be fully explored by the Hospital in the intervening year as a part of the Hospital's responsibility both to assess and to manage risk. He noted that there was very little in the Hospital records over the past year and nothing in the treatment team's response to the Section 501(k) petition about the relationship between Mr. Hinckley and Ms. DeVeau. *See* Gov't Exh. 04–33, Response to 501(k) Motion. Dr. Phillips identified several inconsistencies between what he expected to see this year and what he actually saw. First, he noted that the telephone contact between Mr. Hinckley and Ms. DeVeau appeared to have increased. Second, he noted that Mr. Hinckley's parents did not appear to be aware of the frequency of the contact. Third, he noted that Mr. Hinckley continued to wear the ring given to him by Ms. DeVeau. Dr. Phillips maintains that the status of the relationship and its impact on Mr. Hinckley's mental and emotional well-being have not been adequately assessed and documented by the Hospital. Dr. Phillips does not believe that the end of sexual contact necessarily correlates to the end of a romantic relationship or romantic feelings, and he expressed his great concern that the relationship has been allowed to remain a question mark.

Both Dr. Phillips and Dr. Patterson were asked whether Dr. Keisling's interview with Ms. DeVeau provided the requisite clarity, and both asserted that it did not. Dr. Patterson specifically noted that the statements in Dr. Keisling's notes that Ms. DeVeau "needs to look out for number one" and that she does not want a treatment relationship needed to be more fully explored.[16] Dr. Phillips believes that if

---

**15.** The Court notes that Ms. DeVeau told the treatment team that there has been no change in the level of contact.

**16.** As the Court has already stated, both Dr. Patterson and Dr. Phillips explained that interviewing Ms. DeVeau in the presence of counsel and with limitations placed on the scope of inquiry was unsatisfactory. Dr. Phillips believes that useful information cannot be obtained from Ms. DeVeau under the restrictions imposed. Ms. DeVeau offered to discuss all aspects of the relationship with Mr. Hinckley, but did not wish to discuss her personal history and her crime. Dr. Patterson explained that in interviewing Ms. DeVeau, her personal history cannot be off the table be-

Ms. DeVeau is going to remain a significant individual in Mr. Hinckley's life, she must be a part of the treatment team process on an ongoing basis. Dr. Patterson agreed that one interview with Ms. DeVeau is insufficient to constitute an adequate evaluation of risk. Dr. Phillips believes that Ms. DeVeau needs to be involved in the ongoing process of assessing the relationship in the context of the continuation of Mr. Hinckley's therapeutic goals. Dr. Patterson agreed that regardless of whether the relationship will be pursued later on, it should be incorporated in the treatment planning process.

Dr. Phillips cautioned, however, that the lack of clarity surrounding the relationship would not have been fully resolved even if he had interviewed Ms. DeVeau himself because the most important clinical issue is not what Ms. DeVeau believes about the nature of the relationship, but rather how Mr. Hinckley feels about her position. Dr. Patterson testified that there is no reason that this relationship is not clinically important just because it is a "real" relationship. Rather, Mr. Hinckley knows what it was to be in love with this person, and it therefore is not reasonable to think he will not miss that. Dr. Phillips is no longer certain that Mr. Hinckley really has dealt with the change in his relationship with Ms. DeVeau. Dr. Phillips noted with concern Mr. Hinckley's analogy between his conditional release with the continued bar on contact with Ms. DeVeau and the situation of a married man who travels while his wife stays home. Dr. Patterson agreed that there were a number of matters addressed at the hearing that Mr. Hinckley may be avoiding dealing with and that, although there is a low potential for impulsive behavior, it is unclear what will happen if he is confronted with something that is really painful for him while on conditional release. Dr. Patterson concluded, therefore, that there should be interviews including both Ms. DeVeau and Mr. Hinckley to adequately assess the relationship.

Dr. Patterson and Dr. Phillips oppose both the Hospital's Section 501(e) proposal and the Section 501(k) petition filed by Mr. Hinckley. Dr. Phillips noted that the treatment team had proposed a more gradual program this year than that finally presented to the Court by the Review Board in the Section 501(e) proposal.[17] Dr. Phillips noted that both proposals are significantly less gradual than the Phase III visits proposed by the Hospital in 2003. Dr. Phillips stated that there was nothing in the record that would preclude a continuation of the current regime of releases of Mr. Hinckley in his parents' custody and indicated that stopping all visits "in their tracks" at this time while the Hospital explores Mr. Hinckley's relationship with Ms. DeVeau could potentially be counterproductive. See also Phillips Rep. at 9. Dr. Phillips noted, however, that he could argue both for and against continuing the current conditions of release until the risk now identified has been fully assessed.

Dr. Patterson opined that the Section 501(k) proposal is too fast and lacks adequate clinical assessment between visits

cause it may be relevant to the intensity of or the change in her relationship with Mr. Hinckley. Dr. Phillips further explained that the presence of counsel would compromise the clinical integrity of the interview because the presence of a third party would have an impact on the interview, even if that third party didn't speak. Dr. Phillips noted that the letters between counsel for the parties and counsel for Ms. DeVeau indicated that there were already undercurrents of an adversarial process.

17. The treatment team had suggested three night visits at the parents' home followed by ongoing five night visits at intervals of no less than six weeks.

and that the Section 501(e) proposal is too broad. Dr. Patterson testified that he would be more comfortable beginning with the Phase III suggestion from 2003 providing that the risk factor of the relationship with Ms. DeVeau is first evaluated and put in context in the treatment plan. Dr. Patterson described Mr. Hinckley's relationship with Mr. DeVeau as "unchanged, unexplored, and guarded." He explained that whether it would be appropriate to move on to Phase III visits while working on clarifying the relationship would depend on the outcome of the initial interviews with Ms. DeVeau.

Dr. Patterson testified that in his opinion the most cautious position would be to do nothing until the relationship is clarified and there is clear feedback from the treatment team to the Review Board. The next most cautious path would be to move on to Phase III as suggested in 2003. The third possibility would be to go forward with the Hospital's recommended visit over Thanksgiving and then, if successful, over Christmas. Dr. Patterson explained, however, that the treatment team needs not only to spend time interviewing Ms. DeVeau, but also to spend considerable time with Mr. Hinckley in light of all that he was exposed to during the course of the hearing and as a result of Dr. Keisling's recent interview with Ms. DeVeau. Dr. Patterson opined that the problem with simply going ahead with more Phase II visits, like those already successfully completed, was that important information regarding the relationship came to light not as a result of the debriefings after the Phase I and Phase II outings or during normal therapy or treatment team sessions during the past year, but only as a result of the preparation for this hearing.

Dr. Phillips acknowledged that Mr. Hinckley's privileges could be withheld if Ms. DeVeau decides not to renew her participation in his treatment, but noted that it was Mr. Hinckley's choice whether or not to engage in the relationship. Dr. Phillips explained that both Ms. DeVeau and Mr. Hinckley are insanity acquitees and that they are familiar with the process of both acquittal and conditional release. Mr. Hinckley "knows full well" what issues are going to be problematic, and yet he has chosen to continue in a relationship in which there has been historic evidence of questions of secretiveness, in which there has been behavior that has caused great clinical concern, and about which there has been extensive discussion about the need to clarify the relationship. Dr. Patterson agrees that it is a choice to be made by Mr. Hinckley whether to continue a relationship with a person who, if she refuses to participate with the Hospital in his treatment, may be holding up the progress of the conditional release. If Ms. DeVeau is not forthcoming with information, or does not want to share the necessary information with the doctors, then Mr. Hinckley must decide what he is going to do about the relationship.

### B. Rebuttal Witnesses

After the government's experts had concluded their testimony on November 10, 2004, Mr. Hinckley's counsel announced that the treatment team had, that morning, met with Ms. DeVeau in the presence of her counsel. Over the government's objection, the Court agreed to hear testimony from Dr. Binks and Dr. Montalbano regarding the Hospital's meeting with Ms. DeVeau.

#### 1. Petitioner's Witnesses

Dr. Montalbano testified that Mr. Hinckley's counsel, Mr. Levine, reminded him on the second day of the hearing that the Hospital had proposed a visit that would be about two weeks away, and that there is currently a two week notification requirement. Mr. Levine then asked Dr.

Montalbano when the Hospital was going to meet with Ms. DeVeau. As a result of his conversation with Mr. Levine, Dr. Montalbano called Mr. Henneberry and said that since the focus of the hearing was on the relationship between Mr. Hinckley and Ms. DeVeau, he thought the Hospital should contact and meet with Ms. DeVeau, even though it would look like a "rush job." Mr. Henneberry reluctantly agreed that Dr. Montalbano should call Ms. De-Veau's lawyer. Dr. Montalbano then called Ms. DeVeau's counsel to arrange for a meeting between Ms. DeVeau, her lawyer and the treatment team at the hospital at 9:30 a.m. the next morning.

Dr. Binks testified that he and other members of the treatment team met with Ms. DeVeau and her counsel for slightly more than two hours on the morning of Wednesday, November 10. Mr. Kevin Shamblee (a social worker), Dr. Glenda James (the clinical administrator) and Dr. Thomas Green (Mr. Hinckley's treating psychiatrist) also participated.[18] Dr. Binks conducted the questioning, as requested by Dr. Montalbano. Dr. Binks also wrote the treatment note. *See* Defendant's Exh. 04–03, Treatment Team Note. No one else reviewed the note before it was submitted to the Review Board and there was essentially no input from the other team members. Dr. Binks testified that Ms. DeVeau seemed honest and open with the treatment team, spoke in a narrative format, and answered all of the team's questions. Ms. DeVeau's attorney never directed her not to answer a question or gave her other verbal or visual cues. Dr. Binks acknowledged that Ms. DeVeau's attorney would, at times "clarify" a question.

Ms. DeVeau explained that her relationship with Mr. Hinckley began to change gradually around the year 2000 when they were preparing for a hearing and she was involved in a job change and recognized the type of intense scrutiny she would be under if the romantic relationship continued. Ms. DeVeau indicated that their current pattern of two daily phone calls and one weekly visit was established at that point and has continued in that fashion. They stopped having physical contact at that time and she stopped saying "I love you"; when Mr. Hinckley said it to her, she rebuffed him and he eventually stopped. Ms. DeVeau stated that her telephone conversations with Mr. Hinckley are brief, generally five to ten minutes, and that the call might be extended if there were something more challenging going on in either one of their lives. Ms. DeVeau noticed that Mr. Hinckley was sad at first about the change in their relationship, but stated that he recovered from it and adapted. Ms. DeVeau does not believe that Mr. Hinckley is currently sad about the relationship and has seen no indication that he is fantasizing about her. Ms. De-Veau indicated that she cares for Mr. Hinckley very much and would like to remain his friend. Although she is not in favor of a court order ending their relationship, she believes that Mr. Hinckley would be able to adapt to that if ordered to end the friendship by the Court. She stated that Mr. Hinckley is focused on the positive changes in his release status and his future with his parents. Ms. DeVeau indicated that she herself would be open to meeting with the treatment team in the future, possibly without her counsel.

Dr. Binks testified that what he was told by Ms. DeVeau during their meeting was consistent with what he had been told by Mr. Hinckley. Dr. Binks believes that the

---

**18.** Dr. Green arrived shortly after the meeting started and left periodically. Dr. James was present for about half the meeting.

relationship between Ms. DeVeau and Mr. Hinckley is clear to him; the romantic relationship has ended, but the friendship remains strong and important. As long as Ms. DeVeau is in Mr. Hinckley's life, however, Dr. Binks will always want to know how the relationship is transforming and adapting. Dr. Binks believes that the treatment team should be meeting with Ms. DeVeau on a quarterly basis. Dr. Binks testified that he told the treatment team that it was important to interview or meet with Ms. DeVeau, but because of the change in the relationship, the Court order precluding contact during the outings, and the time spent in preparation for the eight outings in the past year, this may have become a lower priority for the treatment team. If the Court allows contact with Ms. DeVeau on conditional releases, then Dr. Binks believes that feedback should be obtained from Ms. DeVeau as well as from Mr. Hinckley and his parents. Dr. Binks believes that Mr. Hinckley's relationship with Ms. DeVeau is positive and therapeutic and that to end it would be antitherapeutic. The meeting with Ms. DeVeau reinforced Dr. Binks' opinion that Mr. Hinckley would not be a danger to himself or others under either the Section 501(e) or the Section 501(k) proposal.

Dr. Binks conceded that part of the purpose of the interview with Ms. DeVeau was to confirm what he had been told by Mr. Hinckley. Dr. Binks acknowledged that Ms. DeVeau had given Mr. Hinckley a copy of the *Washington Post* the day after the state funeral for President Reagan, which included many articles about and many photographs of President Reagan, but that Dr. Binks never spoke with Mr. Hinckley about the newspaper. Dr. Binks also testified that Mr. Hinckley and Ms. DeVeau have been talking on the telephone during the course of the hearing, but he did not ask Ms. DeVeau about those conversations. Dr. Binks likewise did not ask Ms. DeVeau what she had meant in her interview with Dr. Keisling about "looking out for number one" or the comment about not wanting a treatment relationship. Dr. Binks acknowledged that it is unusual for a therapist to testify in a post-trial proceeding and that he finds the experience extremely awkward.

Having reviewed the treatment team note of the November 10, 2004 interview of Ms. DeVeau, Dr. Montalbano testified that he continues to believe Mr. Hinckley's risk of dangerousness in the context of the Hospital's Section 501(e) proposal is extremely low. Dr. Montalbano identified Mr. Hinckley's primary risk factors as depression accompanied by suicidal ideation and delusions, but noted that these risk factors have been in remission for at least ten years, possibly 15 or 16 years. Dr. Montalbano believes that the conditional release visits actually ameliorate the risk factor of depression and noted that it will be extremely therapeutic for Mr. Hinckley to feel embraced within his family. Dr. Montalbano believes Mr. Hinckley's other risk factors to be: (1) social isolation/self-absorption, (2) deceptiveness or guardedness, (3) weapon access, and (4) perception of relationships, particularly perception of rejection. Dr. Montalbano feels that Mr. Hinckley's Axis IV psychosocial stressors are problems with the legal system/crime and notoriety. Dr. Montalbano describes all of these risk factors as strands of a web, and as strands are removed, risk decreases, particularly when the primary risk factors are removed. Dr. Montalbano explained that the majority of "strands" in Mr. Hinckley's web are already gone and all that remains is the possibility of future rejection in the context of the relationship with Ms. DeVeau.

Dr. Montalbano does not believe Mr. Hinckley is being deceitful and finds no evidence of current deception, but he notes

that Mr. Hinckley does not volunteer information unless the right questions are asked. Dr. Montalbano believes that although Mr. Hinckley is somewhat more open, he is still not "psychologically minded;" that is, he does not want to focus on negative things and one must ask the right questions and probe to get information. Dr. Montalbano believes that the treatment team's interview with Ms. DeVeau on November 10, 2004, provided additional information demonstrating that there is no discrepancy between their perceptions of the relationship and that Mr. Hinckley has already dealt successfully with rejection in the context of the relationship. In contrast to Dr. Binks, Dr. Montalbano believes that there needs to be regular ongoing meetings with Ms. DeVeau probably once a month, and that she need to be integrated into the treatment planning. Although Dr. Montalbano feels that the outings are therapeutic, he believes that Mr Hinckley would "cope" if they were stopped.

### 2. The Government's Witnesses

Both government experts were recalled to explain their reaction to the treatment team's meeting with Ms. DeVeau. Dr. Phillips indicated that it was good that the process of contacting Ms. DeVeau had begun. Dr. Patterson thought it was a start, but would not agree that it was a good start. Neither Dr. Phillips' nor Dr. Pat-

terson's concerns regarding the relationship were satisfied. Both Dr. Patterson and Dr. Phillips were seriously concerned about the manner in which the interview came about, the fact that counsel participated, the fact that the questioning was led by Mr. Hinckley's individual therapist, Dr. Binks, and some of the information that was obtained. Dr. Phillips indicated that he is now less clear about issues that are of great clinical importance and was quite concerned about certain inconsistencies he saw emerging. For example, Dr. Phillips was concerned that the conversations between Ms. DeVeau and Mr. Hinckley were not necessarily all superficial, as he had believed, and that they have been speaking twice a day by phone for a few years.[19] Dr. Phillips also indicated that Mr. Hinckley had not told him about receiving the issue of the *Washington Post* covering President Reagan's state funeral.[20] Dr. Patterson noted an inconsistency between Ms. DeVeau telling Dr. Keisling that she did not want a therapeutic relationship and telling Dr. Binks she was willing to be involved in the process. Both Dr. Patterson and Dr. Phillips were particularly troubled by the fact that Ms. DeVeau's counsel was "clarifying" questions asked by the doctors.

Dr. Phillips reiterated his opinion that because Ms. DeVeau is a significant person in Mr. Hinckley's life, she needs to be

19. When shown Dr. Patterson's 2003 report, indicating that Mr. Hinckley and Ms. DeVeau speak "every day," Dr. Phillips testified that he thought, in context, that meant once a day. He also testified that Mr. Hinckley had told him in 2003 that he and Ms. DeVeau spoke "nightly."

20. Mr. Hinckley's counsel pointed out in his closing argument that both Dr. Patterson's and Dr. Phillips' reports contained references to Mr. Hinckley's discussion of his reaction to learning that President Reagan had wanted to come to visit him. This information was first

published in the *Washington Post* article on the day following the state funeral and so Mr. Hinckley was referring to the article, even if he did specifically state that he had a copy of the newspaper. Dr. Phillips also acknowledged that Mr. Hinckley had told Dr. Phillips that he read the *Washington Post* and that Dr. Patterson's report indicated that Mr. Hinckley told him that he read the *Washington Post*. There does not appear to be evidence in the Hospital records that Mr. Hinckley told the treatment team that he regularly read the *Washington Post*.

involved in the treatment process and that the role that she currently plays in his life is unclear. Dr. Phillips explained that the relationship is particularly important because Ms. DeVeau has always been at the nexus when things have gone wrong with Mr. Hinckley's conditional release proposals. Because Dr. Binks' progress notes during 2004 and other Hospital notes are virtually devoid of any reference to Ms. DeVeau or any conversations with Mr. Hinckley about Ms. Deveau, it does not appear that the nature of the relationship has been explored or clarified. Dr. Phillips has no sense that Mr. Hinckley fully appreciates that Ms. DeVeau is no longer interested in a romantic relationship, but wishes to continue only as his friend. Dr. Phillips is also concerned that no one seems to know what Mr. Hinckley and Ms. DeVeau have talked about, particularly during the hearings. Dr. Patterson believes that it would be of major benefit to have face-to-face meetings with Mr. Hinckley and Ms. DeVeau together and possibly reinstitute conjoint therapy.

Dr. Phillips considers the means by which the treatment team's interview with Ms. DeVeau came to pass to be "profound and significant." He considers it to have been unwise to have deviated from the standard Hospital protocols, particularly in Mr. Hinckley's case where narcissism is one of his diagnoses. Dr. Patterson agreed that turning a hearing "on its ear" to do something at the last minute, mid-hearing, that should have been done over the course of the past year is "unprecedented" and conveys a message to Mr. Hinckley that he is special. Dr. Phillips testified that he has never seen treatment planning occur amidst a hearing in a "willy-nilly fashion" such as occurred here. Dr. Patterson concurred that he had never seen an investigatory evaluative process conducted during the course of a release hearing. Dr. Phillips believes that this could have a profound affect on someone like Mr. Hinckley whose primary diagnosis is narcissism and that such behavior by the Hospital could fuel his narcissism.

Dr. Phillips also has concerns about therapists testifying in release hearings. Dr. Patterson agrees that it puts the therapist in a "precarious" position. Dr. Patterson testified that although a therapist might testify about treatment, he should not opine as to what a court should do. Dr. Patterson also testified that a patient's expert witnesses are rarely hospital staff members. Both doctors agreed that treatment is fundamental in considering the appropriate conditions of conditional release. Both doctors noted that it is not unusual for conditions of release to contract and expand over time, and that just because a patient successfully completes step one does not mean that the patient automatically should go to step two. If more information is needed, then the logical next step should be postponed.

After the November 10, 2004 treatment team interview of Ms. DeVeau, as reported by Dr. Binks and Dr. Montalbano, both Dr. Phillips and Dr. Patterson remain convinced that both the Section 501(e) proposal and the Section 501(k) petition are inappropriate at this time.

### C. Mr. Hinckley's Sister

Diane Hinckley Sims, Mr. Hinckley's sister, testified that she and her brother Scott joined her parents for the day-long outing with Mr. Hinckley in April 2004. This was the first time she had seen her brother in four of five years and only the fourth time she had seen him in over 20 years. She testified that if her parents became ill or were no longer capable, she would be willing to assume the custodial supervision of Mr. Hinckley and would take him to Dallas to live with her and her

husband if necessary.[21] Mrs. Sims testified that she has no formal training in mental illness or with respect to her brother's symptoms and that she has not met with any member of the treatment team, Dr. Phillips, Dr. Patterson, or Dr. Lee.

## III. FINDINGS OF FACT

Based upon the testimony and exhibits offered by the government and counsel for petitioner, the Court finds that the following facts have been established by a preponderance of the evidence:

1. Mr. Hinckley's current diagnosis is psychotic disorder not otherwise specified (Axis I), in remission; major depression (Axis I), in remission; and narcissistic personality disorder (Axis II).

2. Mr. Hinckley's Axis I diagnoses have been in remission for at least ten, and perhaps as many as sixteen years.

3. Mr. Hinckley's narcissistic personality disorder is significantly attenuated from its previous state. Mr. Hinckley continues to exhibit symptoms of grandiosity and self-importance, but no longer exhibits the intense self-absorption that was present during the 1980s.

4. Mr. Hinckley has exhibited no evidence of delusional thinking for approximately fifteen years and no evidence of obsessive conduct for at least eight years.

5. Mr. Hinckley has continued to exhibit deceptive behavior even when there have been no symptoms of psychosis or depression. Such deceptiveness may relate to his narcissistic personality disorder.

6. Mr. Hinckley continues to be guarded and defensive.

7. Mr. Hinckley's self-reporting underrepresents his problems and pathology due to a tendency to minimize problems and avoid negative aspects of situations to present himself in an overly positive light.

8. Mr. Hinckley has exhibited no violent behavior, nor attempted suicide, in over 20 years.

9. Mr. Hinckley's Axis IV diagnosis relates to his "current stressors." In addition to his long-term mental illness (his Axis I diagnoses) and his personality disorder (narcissism), they are: involvement with the legal system, notoriety, reintegration into society/living in the community, and the possible ambiguity or lack of clarity regarding his relationship with his significant other.

10. Historically, relationships and Mr. Hinckley's perceptions of those relationships, especially relationships with women, have been inextricably intertwined with Mr. Hinckley's mental illness and have been especially implicated when he has been most clinically dysfunctional.

11. Mr. Hinckley has never tried to escape from the Hospital or when on "B" city outings or unsupervised conditional release visits with his parents. He has participated successfully in over 200 Hospital-accompanied outings in the community without incident. During the past year, he has participated successfully in six unsupervised day visits with his parents (Phase I) and two unsupervised overnight visits with his parents (Phase II). He has followed every condition imposed by the Court in authorizing

---

21. Mrs. Sims also has a 23 year old daughter and a 27 year old son, but there was no testimony about whether either lives with Mrs. Sims and her husband.

these visits. These visits have been therapeutic and beneficial.

12. Were Mr. Hinckley to experience a relapse of his Axis I disorders, that relapse would not occur suddenly, but rather would occur gradually over a period of at least weeks or months. A relapse would not occur during the course of a 48–hour conditional or even longer release.

13. Mr. Hinckley self-medicates with 1mg of Risperdal per day. There is no indication that Mr. Hinckley has failed to take his medication in the recent past or during any of the authorized outings with his parents. Were Mr. Hinckley to cease to take his medication over the course of a 12 or 36 hour visit, it would have no physiological effect.

14. Mr. Hinckley's parents have proved themselves to be appropriate custodians for Mr. Hinckley's Phase I and Phase II outings under the conditions approved by the Court.

15. Mr. Hinckley's brother and sister are not currently appropriate custodians for Mr. Hinckley.

16. Mr. Hinckley and Ms. DeVeau both state that their relationship has changed from a romantic relationship to a platonic one, a deep friendship that is important to both of them, and that they see each other once a week and talk on the telephone twice a day. There are no clear contradictions between the assertions with respect to the frequency of their contacts and the testimony before the Court at the November 2003 hearing. The relationship has been an important emotional support for Mr. Hinckley.

17. The lack of clarity about the nature of the relationship between Mr. Hinckley and Ms. DeVeau, and the "possibility" of deception surrounding the relationship, identified by the Court in its Opinion nearly a year ago, have not been explored by the treatment team or the Hospital or even discussed by them with Mr. Hinckley. The two interviews with Ms. DeVeau, one just before and the other during this hearing, fail to provide clarity, in part because the treatment team has not discussed those interviews with Mr. Hinckley.

18. In view of the unanimous opinion of the experts that the Phase I and Phase II outings have been therapeutic and successful and have posed no danger, it would be counterproductive and antitherapeutic to eliminate all outings for Mr. Hinckley with his parents until after his relationship with Ms. DeVeau has been further explored and clarified.

19. In view of the opinions of Dr. Binks, Dr. Keisling, Dr. Montalbano and Dr. Phillips that Mr. Hinckley would not be a danger to himself or others in the foreseeable future with a continuation of the Phase II outings, or (in the opinion of the Hospital's doctors and Dr. Keisling, even the Phase III visits), the Court finds that Mr. Hinckley will not pose a danger to himself or others if the Phase II outings are continued under the conditions previously approved by the Court.

On the ultimate mixed question of law and fact, dangerousness, the Court cannot find, given the testimony by the government experts, that Mr. Hinckley will not be a danger to himself or others under either the Section 501(k) petition filed by Mr. Hinckley or the Section 501(e) proposal submitted by the Hospital. The Court does find, however, that Mr. Hinckley will not in the reasonable future be a danger to himself or others under addi-

tional Phase II visits under the same conditions as those imposed by the Court in its December 17, 2003 Order.

## IV. DENIAL OF MR. HINCKLEY'S SECTION 501(k) PETITION

Mr. Hinckley's Section 501(k) petition seeks visits to his parents' home outside the Washington, D.C. metropolitan area for a period of four nights and five days, at no more than two week intervals and with no more than three days' notice to the government and the Court. The Hospital and the majority of the expert witnesses agree that Mr. Hinckley's Section 501(k) proposal is clinically inappropriate. While he has been successful on two 32–hour one-night overnight outings with his parents in the Washington, D.C. metropolitan area, with careful evaluation after each and two weeks' advance notice to the government and the Court, the Section 501(k) proposal is too much, too soon, too fast, with insufficient planning and Hospital analysis and oversight. This Court sees no reason to disagree with the opinions of the medical professionals. Mr. Hinckley's petition for limited conditional release under Section 501(k) therefore is denied.

## V. DENIAL OF HOSPITAL'S SECTION 501(e) PROPOSAL

In contrast to Mr. Hinckley's petition, the proposal offered by the Hospital under Section 501(e) is supported by the Hospital and by the experts testifying on behalf of Mr. Hinckley. The proposal is, however, opposed by the government's experts as, at the very least, premature. The primary concerns expressed by Dr. Phillips and Dr. Patterson relate to the status of Mr. Hinckley's relationship with Ms. DeVeau and the fact that in the past year no one has assessed the nature of the relationship and the impact of the relationship on Mr. Hinckley's emotional state. The Hospital's

proposal is devoid of any sense that the clinical concerns raised at the November 2003 hearing were considered or explored. In addition, it proposes more time—up to six days and five nights—away from the Hospital than either Phase II or Phase III of last year's Section 501(e) proposal; it is thus not a gradual and carefully calibrated increase in privileges. The Court cannot conclude that prolonged visits to Mr. Hinckley's parents' home are appropriate when an important risk factor remains unaddressed by the Hospital. The Hospital's proposal under Section 501(e) therefore is denied.

## VI. GRANTING OF ADDITIONAL PHASE II VISITS

■ In considering proposals for conditional release, the Court is not limited by the proposals submitted by the patient and/or the Hospital, but rather may fashion its own, lesser relief should such relief seem prudent. *See* D.C.Code § 24–501(e) (conditional release "under such conditions as the court shall see fit"). The Court is unconvinced that overnight visits outside the Washington, D.C. area of any duration are appropriate at this time. The Court again notes, however, the opinion of all of the experts that the eight conditional release visits already completed were successful, uneventful and extremely therapeutic for Mr. Hinckley with no evidence whatsoever of decompensation or dangerousness, and the opinion of some of the experts—which the Court shares—that to suddenly stop the conditional releases altogether would be antitherapeutic. The Court therefore concludes that it would be appropriate for Mr. Hinckley to complete several more—at least four and perhaps up to six—local, overnight visits in the Washington, D.C. area (that is, again within a 50–mile radius of the Hospital) in the custody and under the supervision of his

parents and under the same conditions as governed last year's Phase II outings. In the meanwhile, the Hospital must work diligently to clarify the status of the relationship between Mr. Hinckley and Ms. DeVeau and to explore it fully with both of them separately and, if clinically indicated, together. Depending on the Hospital's assessment of the relationship and its evaluation of the additional Phase II outings, the Hospital may return to the Court with a Section 501(e) either after the successful completion of four additional Phase II outings or, in its professional judgment, after all six have been completed. There will be no contact with Ms. DeVeau during the Phase II outings.

\*　　\*　　\*　　\*　　\*　　\*

The Court cannot conclude its discussion without noting that this entire matter could have been presented to the Court in a much more professional and orderly way if the Hospital only had heeded the concerns raised by Dr. Phillips and Dr. Patterson at last year's hearing and understood that it was those very concerns that led the Court to prohibit any contact between Mr. Hinckley and Ms. DeVeau while Mr. Hinckley was on outings with his parents. Yet the Hospital made no attempt to meet with Ms. DeVeau in the past year or to speak with Mr. Hinckley about his relationship with her. Even though Dr. Binks testified that he thought it was "critical" to speak with Ms. DeVeau and informed the treatment team of that concern, communication between Ms. DeVeau and the Hospital was broken off over a year ago, just before the November 2003 hearing. With the exception of the risk assessment done by Dr. Montalbano in November 2004, the relationship between Mr. Hinckley and Ms. DeVeau is essentially unaddressed in the Hospital's records over the past year. While Dr. Binks testified that he did occasionally discuss Ms.

DeVeau with Mr. Hinckley during their treatment sessions, Ms. DeVeau's name appears only a few times in his progress notes, and never in the context of a discussion about the relationship. Certainly it is not "clinically appropriate" simply to ignore a significant relationship—perhaps the most significant relationship—in the life of Mr. Hinckley. Yet that is precisely what the Hospital has done.

The hearing in this case has been a moving target. Eleventh hour meetings with Leslie DeVeau which should have been conducted over the last twelve months and are instead brought about at the instigation of petitioner's counsel during the course of the hearing strike the Court as imprudent. It is folly to presume that a single meeting, hastily arranged during the hearing, would satisfy anyone's burden to the Court. The Court is neither a psychologist nor a psychiatrist, but the Court cannot believe that such a chaotic process is clinically or therapeutically helpful. It is extremely disappointing that the concerns raised a year ago were not addressed in the context of the standard course of Mr. Hinckley's treatment so that a clearer portrait of the current situation could have been placed before the government's experts and before the Court. The circus-like tenor of this proceeding could have been avoided. As Dr. Patterson noted, this is not how a conditional release hearing is supposed to proceed.

Nevertheless, the Hospital's failings should not be laid at the feet of Mr. Hinckley. He did not hide the fact that he talked to Ms. DeVeau daily by phone and saw her once a week; the question is whether he made clear (or was ever even asked) whether he spoke to her by telephone once a day or twice a day. One could speculate that he was being deceptive or guarded or was just not forthcom-

ing,[22] and these certainly are areas that must be explored given Mr. Hinckley's history with relationships, both real and fantasized, and their connection to his mental illness. It also is important to know the current nature of the relationship and how Mr. Hinckley responds to Ms. DeVeau's view of where matters now stand, issues the treatment team never discussed with him because they never met with Ms. DeVeau until the hearing was underway. These are potential risk factors that must be assessed and, if appropriate, managed.[23] Why the Hospital did not appreciate this a year ago is a mystery.[24]

While the concerns raised by Dr. Phillips and Dr. Patterson regarding the lack of clarity concerning the current nature of the relationship between Mr. Hinckley and Ms. DeVeau must be thoroughly explored, the Court does not believe that the need to do so precludes additional Phase II outings. It finds that it is not reasonably foreseeable that Mr. Hinckley will be a danger to himself or others if such outings are permitted to continue under the conditions previously imposed. Because of the ongoing lack of clarity with respect to the relationship between Mr. Hinckley and Ms. DeVeau, Mr. Hinckley will continue to be prohibited from having any contact with Ms. DeVeau, either in person or by telephone, during the course of the further Phase II outings. Any contact with Ms. DeVeau during a conditional release will be considered a violation of the conditional release, and Mr. Hinckley will be returned immediately to the Hospital. The Court hopes that its message to the Hospital this year is clearer than it was last year.

Finally, the Court expresses its reservations about Mr. Hinckley's siblings acting as custodians in the future. There is the recurring concern about the age of Mr. Hinckley's parents, and it would certainly seem advisable to bring other potential custodians into the treatment process. At the hearing, Mr. Hinckley's sister testified that she is willing to be a custodian for Mr. Hinckley and that Mr. Hinckley's brother, Scott Hinckley, is as well. Although the Court does not doubt Mrs. Sims' good intentions, Mrs. Sims and her brother have taken part in only one of the eight conditional release outings and their previous face-to-face interactions with Mr. Hinckley have been extremely limited. Mrs. Sims testified that she has only met with her brother three or four times since he was hospitalized 22 years ago. Mrs. Sims has

**22.** Dr. Montalbano testified that Mr. Hinckley is a not forthcoming person, and the treatment team knows this. He must be asked the correct questions in order to elicit information.

**23.** The Court is concerned that Dr. Montalbano, Dr. Patterson, and Dr. Phillips, all of whom acknowledge the importance of the relationship between Mr. Hinckley and Ms. DeVeau, are readily willing to suggest that Mr. Hinckley should choose between his relationship and greater freedom and privileges. Although the Court is not a clinician, it seems unwise to encourage Mr. Hinckley, who historically has had issues with self-absorption and isolation, to "choose" to terminate a relationship which is, perhaps, his only real friendship. It is one thing to say that, therapeutically, the relationship should be better understood. It is quite another to say that because it is not understood, it must end. The Catch–22 presented by the experts' testimony exists because of the Hospital's failings, not necessarily Mr. Hinckley's.

**24.** As the government pointed out, there was also nothing in the Hospital records regarding the death of President Reagan on June 5, 2004 or the state funeral on June 11, 2004, and the fact that Mr. Hinckley read the *Washington Post* on the day following the state funeral. Nor is there any evidence that anyone other than his parents ever discussed with Mr. Hinckley his reaction to President Reagan's death—clearly a very important event in the context of Mr. Hinckley.

never met with any of the doctors on the treatment team to discuss her brother's mental condition. Thus, the Hospital has never made any determination whether she and her family or her brother Scott and his family understand the responsibilities that they would have as custodians for overnight, weekend or longer visits in the future and whether they are truly willing and able to serve in such capacity. It would not be appropriate at this time to allow Mr. Hinckley's siblings to serve as custodians. The Court can only encourage Mrs. Sims and Mr. Scott Hinckley, if they do intend to be a part of Mr. Hinckley's future treatment, to make serious attempts to become more involved in the conditional release process and spend time with the Hospital staff.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

### ORDER

For the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that Petitioner John W. Hinckley, Jr.'s petition under D.C.Code § 24–501(k) for limited conditional release is DENIED; it is

FURTHER ORDERED that St. Elizabeths Hospital's proposal for overnight visits outside of the Washington D.C. area under D.C.Code § 24–501(e) is DENIED; and it is

FURTHER ORDERED that the Court will permit (subject to successful conclusion of each) no fewer than four and no more than six local overnight visits (Phase II) in the Washington, D.C. area subject to the following conditions:

1. Mr. Hinckley is being allowed a limited conditional release under the supervision of his parents. He is not permitted to leave his parents' supervision at any time during the course of the conditional release.

2. Mr. Hinckley will be allowed six 32–hour local overnight visits within a 50–mile radius of Washington D.C. (Phase II). The success of each visit will be thoroughly assessed by the Hospital before a subsequent visit is permitted.

3. A detailed itinerary will be developed by the Hospital and submitted, under seal, to the Court two weeks prior to each overnight visit in Phase II with information regarding the locations, purposes, therapeutic goals and time frames of the visit. That itinerary also will be provided to defense counsel and to counsel for the government.

4. Mr. and Mrs. Hinckley will sign and agree to the "Agreement to Assume Supervisory Responsibility for Patient while on Limited Conditional Release."

5. Mr. Hinckley and his parents will maintain telephone contact with the Hospital at least once a day during each outing.

6. If there are any signs of decompensation or deterioration in Mr. Hinckley's mental condition, no matter how slight, of danger to himself or others, or of elopement, Mr. Hinckley will immediately be returned to the Hospital.

7. Mr. Hinckley and his parents will sign and agree to adhere to the "Media Plan" which provides that any effort to contact the media, either by Mr. Hinckley or by his parents, in person or by any other means while Mr. Hinckley is on conditional release, will constitute a violation of this conditional release. If approached by the media, the Hinckleys will decline to

speak with them, and if the media persists, the Hinckleys will withdraw.

8. If there are any negative incidents regarding the public or the media, Mr. or Mrs. Hinckley will immediately call the Nursing Supervisor's Office at the Hospital and will return to the Hospital if so directed.

9. Mr. Hinckley will not be allowed any contact with Leslie DeVeau, either in person or by telephone, during the course of the conditional release. Any contact with Ms. DeVeau will be considered a violation of Mr. Hinckley's conditional release, and Mr. Hinckley will be returned immediately to the Hospital.

10. Mr. Hinckley will continue to receive psychotropic medication during these activities, and any failure to self-medicate will be a violation of the conditional release and Mr. Hinckley will be returned immediately to the Hospital.

11. After each outing, Mr. Hinckley's parents will provide the Hospital with a completed "Relapse Prevention Plan Feedback From Responsible Person Supervising Patient While On Conditional Release" form.

12. Mr. Hinckley will fill out the "Relapse Prevention Plan Feedback From Patient While On Conditional Release" form within two hours of returning to the Hospital after each outing.

13. The treatment team will interview Mr. Hinckley and his parents after each outing. The Hospital will write a detailed report following each visit and submit that report under seal to the Court. That report will be provided to both counsel for the defense and counsel for the government.

14. The Hinckleys will stay at a local hotel, and Mr. Hinckley and his par-

ents will share one suite. Mr. Hinckley will not be permitted to leave the suite unless accompanied by at least one parent. Mr. Hinckley will not be permitted to leave his parents' supervision. Any attempt to do so would constitute a violation of his conditions of release.

15. Should Mr. Hinckley fail to adhere to any of the conditions of release imposed on him by this Order, this conditional release will be terminated immediately.

16. The Hospital may not seek further relief under D.C.Code § 24–501(e) until the successful completion of at least four of the six authorized visits.

SO ORDERED.